IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROBIN REDUS, | ) | |
| | ) | |
| Plaintiff, | ) | No. 13-cv-00231 |
| | ) | |
| v. | ) | Judge Andrea R. Wood |
| | ) | |
| ILLINOIS BELL TELEPHONE CO., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Plaintiff Robin Redus claims that Defendant Illinois Bell Telephone Company ("Illinois Bell") discriminated against him because of his race and age by making harassing remarks and retaliated against him by subjecting him to discipline to which other, similarly-situated employees were not subjected. Redus contends that this conduct violated Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §2000e *et seq.*, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1-101 *et seq.* Illinois Bell filed a motion for summary judgment. (Dkt. No. 38.) For the reasons stated below, that motion is granted.

## BACKGROUND

Unless otherwise indicated, the following facts drawn from the parties' statements of material facts are uncontested.

Redus first started working for Illinois Bell as a customer service technician in the Installation and Repair Group on January 17, 1996. (Pl. Resp. to Def. Stmnt. of Mat. Facts ("PRDSMF") ¶ 6, Dkt. No. 47.) In August 2010, Redus volunteered to transfer to Illinois Bell's Construction and Engineering ("C&E") group as a cable-splicing technician. (*Id.* ¶ 7.) In that

position, his primary job was to splice existing cables together or to splice new cables to existing cables. (*Id.* ¶ 8.) All Illinois Bell technicians were required to adhere to Illinois Bell's safety rules, and Redus received a copy of the company's "Tech Expectations" and understood that he was to abide by them at all times. (*Id.* ¶¶ 9–10.) From August 2010 to February 2012, Redus reported to Ed Gerdes, a manager in the C&E Group. (*Id.* ¶ 11.) Redus took three leaves of absence starting in December 2010: one from December 9, 2010 to August 31, 2011 due to a work-related injury; one from December 19, 2011 to July 2012; and one starting on August 22, 2012 due to a work-related injury. (*Id.* ¶¶ 12–13.)

The parties disagree on the amount and kind of training Redus received as part of his job. Redus contends that he asked for basic training on cable splicing and never received it. (Def. Resp. to Pl. Stmnt. of Add'l Mat. Facts ("DRPSAMF") ¶¶ 15–16, Dkt. No. 50.) Meanwhile, Illinois Bell claims that Redus received advanced cable-splicing training, as well as several other training courses and on-the-job training, and was assigned to a Training Development Manager. (*Id.* ¶ 16.) Redus also previously testified that Mike Maddox, his Training Development Manager, would "come pretty frequently," and that he was "responsive" and a "good resource." (*Id.*) Illinois Bell also contends that Redus successfully completed the advanced cable-splicing course. (*Id.*) Redus, however, contends that his Training Development Manager was "not available very often" and that Gerdes would criticize Redus for calling the Training Development Manager for help. (*Id.* ¶ 17.)

Both parties agree, however, that Gerdes placed Redus on performance improvement plans ("PIPs") on the following dates: November 9, 2010, December 2, 2010, October 2011, and December 2011. (PRDSMF ¶ 23.) Gerdes twice issued warnings to Redus regarding the placement of cones around his vehicle while it was parked—in September 2010 and September

2011. (*Id.* ¶ 28.) On October 25, 2010, Redus's ladder strand hooks were found facing outward on his vehicle, which violated Illinois Bell policy and resulted in Redus receiving a written warning from Gerdes. (*Id.* ¶¶ 34–35.) Around that time, Redus also received other warnings related to unlocked bins in his truck and the cleanliness of his vehicle. (*Id.* ¶ 36.) Due to the September 2011 incident regarding improper cone placement, Gerdes issued Redus a written warning and a five-day suspension. (*Id.* ¶ 40.) On November 18, 2011, Redus drove his company vehicle into a downspout, causing the window to shatter. (*Id.* ¶ 42.) Illinois Bell subsequently conducted an investigation and determined that the accident was preventable, and Gerdes then issued Redus a final written warning with a five-day suspension for the accident. (*Id.* ¶¶ 46–47.)[1]

The parties disagree on the comments that Redus claims were made to him concerning his race and age. Redus states that when he was transferred to the C&E Group, his new second-level supervisor, Dan Harper, said to him: "oh, by the way, Mr. Redus, that is, Mike Wiley said if you don't have any more no accesses." (DRPSAMF ¶ 5.) According to Redus, this was a "reference to an issue Wiley purportedly had with [Redus], and had no relationship whatsoever to [Redus]'s new job." (*Id.*) Illinois Bell claims Redus previously testified that after the remark, he "sat there, and [] said, what the heck does that mean?" and that when another technician asked him "what was that about," he responded, "I don't know." (*Id.*)

Redus also contends that shortly after he started with the C&E Group, Wiley called to harass him about a previous incident when he took a pre-approved absence instead of working overtime. Illinois Bell claims that this issue related to Wiley's attempt to determine whether it was appropriate for Redus to request vacation during a mandatory overtime period, that Wiley

---

[1] Redus claims that Gerdes would frequently follow him on the job, sometimes monitoring him for days at a time; Illinois Bell points out that Gerdes previously testified that it was his practice to observe his technicians daily, and that he did this for Redus as well as other technicians working for him. (DRPSAMF ¶ 18.)

ultimately concluded the absence was "okay," and that Redus did not receive any discipline related to it. (*Id.* ¶ 6.)[2]

Redus further claims that soon after his transfer to the C&E Group, his coworkers began to harass him by calling him "Fred Sanford," "Grady," and "old man." (DRPSAMF ¶ 7.) He contends that his coworker, John Steiner, was the first to call him "Fred Sanford," causing three or four other technicians to laugh at him and encouraging Steiner to refer to him as "Fred Sanford" more often. (*Id.*) Redus also claims that Steiner changed his ringtone to the "Sanford and Son" theme song and asked Redus to call his phone on multiple occasions to make the theme song play in the presence of Redus and others. (*Id.* ¶ 8.) On one of those occasions, Gerdes was standing between Redus and Steiner and heard the theme song ringtone. (*Id.*)

In response to these claims, Illinois Bell points to parts of Redus's testimony that it believes contradict his account. For example, Redus testified that Steiner only asked him to call Steiner's phone on four occasions, and Redus simply assumed that each time he called, the theme song ringtone would play. (*Id.*) And while Redus contends that another technician, Chris Higgins, called him "Grady" and made fun of him for his age at a morning meeting and one other occasion (*see id.* ¶ 10), Illinois Bell points to testimony where Redus claimed only that Higgins called him "Grady" on four specific occasions and acknowledged that he could not confirm that Higgins made a comment about his age. (*Id.*)

Redus contends that he complained about the name-calling twice—on October 27, 2010 and again on November 3, 2011. Specifically, on October 27, 2010, Redus complained to Gerdes, causing Gerdes to "smirk" and say "Oh, I'll look into it." (DRPSAMF ¶ 13.) Gerdes then followed Redus to lunch and sat in the parking lot watching him. (*Id.*) Redus also claims that on

---

[2] Redus submitted an affidavit stating that he previously filed a lawsuit against Illinois Bell regarding racial discrimination by Wiley, which was settled. (Pl. Stmnt. of Add'l Mat. Facts, Ex. 2 ¶ 30, Dkt. No. 48-2.)

4

November 3, 2011, a meeting was held between Redus, Harper, and Redus's union stewards. The union steward spoke on Redus's behalf and raised the name-calling issue, specifically mentioning the references to "Sanford & Son" and Redus's age. (*Id.* ¶ 11.) Harper stated he would "get with Mr. Ed Gerdes about the accusations." (*Id.*) At a meeting the next morning, November 4, 2011, Gerdes passed around a photograph of a mistake Redus made on the job with his name prominently displayed—in contrast to the prior practice of distributing mistakes for review anonymously. (*Id.*) Also around November 2010, Redus complained internally regarding age-related comments, which was received by Illinois Bell's Equal Employment Opportunity office around February 2011. (*Id.* ¶ 31.) At that time, Redus also filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Def. Mot. for Summ. J. ¶ 7, Dkt. No. 40-1.)

In December 2010, a manager at Cermak Garage, David Lilly, spoke with Redus "off the record" and told him that the EEOC "is not going to save your job" and "we got the word on you." (DRPSAMF ¶ 25.)[3] Redus also cross-filed two discrimination charges with the Illinois Department of Human Rights ("IDHR") and the EEOC on October 21, 2011 and October 24, 2011. (*Id.* ¶ 31.) Nonetheless, according to Redus, the name calling continued until shortly before his last leave of absence, which began in August 2012.

Finally, Redus claims that other, similarly-situated employees received less severe discipline for similar or more serious infractions, such as receiving one-day suspensions (or no suspension at all) for injury in a preventable occupational accident or failure to comply with company policies. (*Id.* ¶¶ 32–39.)

---

[3] Illinois Bell disputes this characterization and says Redus actually testified that Lilly said that Redus had "a case with the EEOC … it was years ago, and they didn't do a thing for me. Now, what do you think they're going to do for you." (DRPSAMF ¶ 25.)

**DISCUSSION**

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In considering a summary judgment motion, "[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Walbridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994)). "In evaluating whether a genuine issue of material fact exists, all evidence and inferences must be viewed in the light most favorable to the nonmoving party." *Scott v. Edinburg*, 346 F.3d 752, 755 (7th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003)). The "court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence." *Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005).

I. **Discrimination and Retaliation Claims**

In assessing Redus's discrimination claims, this Court must consider "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). For a retaliation claim, the plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that he engaged in a statutorily-protected activity, he suffered a materially-adverse employment action, and there was a but-for causal connection between the two. *Burton v. Bd. of Regents of Univ. of Wis. Sys.*, 851 F.3d 690, 695 (7th Cir. 2017). In applying this legal standard, the Court must consider the evidence as a

whole, "rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Ortiz*, 834 F.3d at 765.

One way of proving a claim is through the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See David v. Bd. of Trs. of Cmty. College Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). This framework allows a plaintiff to set out a *prima facie* case for discrimination by showing that: (1) he is a member of a protected class; (2) his job performance met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly-situated employees outside of his protected class were treated more favorably. *McDonnell Douglas*, 411 U.S. at 802; *David*, 846 F.3d at 225. If a plaintiff's evidence establishes a *prima facie* case of unlawful discrimination, "the burden shifts to the employer to offer a non-discriminatory reason for the adverse employment action." *Morgan v. SVT, LLC*, 724 F.3d 990, 996 (7th Cir. 2013). Where the employer carries its burden, the burden shifts back to the plaintiff to establish that the employer's stated non-discriminatory reason is a pretext. *Simpson v. Beaver Dam Cmty. Hosps., Inc.*, 780 F.3d 784, 790 (7th Cir. 2015); *see also Zayas v. Rockford Memorial Hosp.*, 740 F.3d 1154, 1157 (7th Cir. 2014) (applying the same standard to both age and national origin claims). This burden-shifting framework operates in the same manner for retaliation claims. *Smith v. Lafayette Bank & Trust Co.*, 674 F.3d 665, 657–58 (7th Cir. 2012).

    **A.**    **Direct Evidence**

To begin, Redus has not put forward sufficient direct evidence to support his claims. He claims that some of his coworkers made comments referring to him in the context of "Sanford and Son," including calling him "Grady" or "Fred Sanford," and that one co-worker changed his ringtone to the "Sanford and Son" theme song. He also contends that another co-worker referred

to him as an "old man." These comments happened at least a few times; during Redus's deposition, he specifically identified a handful of instances when his co-workers used these names to refer to him. None of the comments were made by his supervisors, however.

The only comment by Wiley referred to "no accesses," which Redus suggests referred to incidents when Wiley challenged him for being unable to complete work because the property owners were not home to grant him "access" to the property. Similarly, Redus points to Gerdes's "constant observation" and continual discipline, but there is no evidence that Gerdes engaged in any intentional discrimination. Similarly, Redus has failed to put forward any evidence that the name-calling continued after the November 2011 meeting; he has not provided examples of any specific incidences where it took place, nor did he make any reports to management after the November 2011 concerning specific instances of name-calling based on race or age.

### B. *McDonnell Douglas* Burden-Shifting Method

Without direct evidence of discrimination, Redus attempts to proceed under the *McDonnell Douglas* burden-shifting method. Redus has satisfied the first and third prongs under the burden-shifting method of proof: he is a member of a protected class (an African American over the age of 40), and he suffered an adverse employment action in the form of two five-day suspensions. *See Russell v. Bd. of Tr. of Univ. of Ill. at Chi.*, 243 F.3d 336, 341 (7th Cir. 2001) (noting in the context of a "five-day disciplinary suspension" that "in a number of prior decisions this very kind of disciplinary suspension has been found to be a materially adverse employment action for purposes of the prima facie case").[4] He has not, however, presented evidence sufficient to establish the second or the fourth prong of the burden-shifting method.

---

[4] On the other hand, "negative performance evaluations or the inclusion of a letter of concern in an employee's personnel file" do not "in and of themselves constitute a materially adverse action." *de la Rama v. Ill. Dept. of Human Servs.*, 541 F.3d 681, 686 (7th Cir. 2008).

1. **Employer's Legitimate Expectations**

Redus has not established that he was meeting his employer's legitimate expectations as required by the second prong of the burden-shifting method.

Redus does not contest that he failed to place safety cones around his vehicle on September 15, 2010 or that Illinois Bell has had a policy since 1996 requiring the placement of safety cones around vehicles. Instead, he contends that he never received "any written material regarding cone placement." (Pl. Stmnt. of Add'l Mat. Facts ("PSAMF") ¶ 19, Dkt. No. 48.) Redus was issued a verbal warning for that conduct. Redus also admits that, on October 25, 2010, the ladder strand hooks on his ladder were facing outward, instead of inward, in violation of Illinois Bell policy. Redus was issued a formal written warning for that conduct, as it was his second violation in just over a month. Redus also received two PIPs in November and December 2010 for schedule deviations, which he claims are attributable to his attendance at an advanced cable-splicing class. (*Id.* ¶¶ 23–24.) Redus was then out on a leave of absence from December 19, 2010 to August 31, 2011 due to a work-related injury.

In early September 2011, Gerdes witnessed Redus improperly descend a ladder (causing him to miss the second-to-last rung), saw him ascend a ladder with his tools loosely hooked to a bucket on his belt, and saw his ladder hooked to a loose cable (instead of a secure cable strand) causing the ladder to be unsteady. (PRDSMF ¶¶ 32, 34.) On September 7, 2011, Gerdes also observed Redus parked on a public street without safety cones properly placed around his vehicle. (*Id.* ¶ 39.) Redus admits that his cones were "out incorrectly." (*Id.*) As a result of this conduct, he was issued a written warning and a five-day suspension for unsafe work practices. (*Id.* ¶ 40.) About two months later, on November 18, 2011, Redus drove his company vehicle into the side of a building shattering a window. (*Id.* ¶ 42.) After an investigation, Gerdes concluded that the

accident was preventable and issued Redus another five-day suspension for the incident. (*Id.*
¶ 47.) Redus also notes that he was issued PIPs in October 2011 and December 2011 for time-sheet errors, which he contests by arguing that he was never informed what the errors were and he was never trained on time-sheet entry. (DRPSAMF ¶ 28.)

In total, Redus acknowledges that he had a safety violation in September 2010, another in October 2010, a number of violations in September 2011, and a car accident in November 2011—which add up to at least seven violations in a little over a year.[5] (If one excludes the time he spent out on leave, Redus actually had at least seven violations in seven months.)

Redus argues that to the extent he was not meeting Illinois Bell's legitimate expectations it was because Illinois Bell failed to provide him with proper training and his supervisors unfairly focused on him for discipline. These allegations, however, have not been tied to any evidence that the ***reason*** for his purported lack of training or the unfair focus on him was his race or his age. "[I]t is not even the court's concern that an employer may be wrong about its employee's performance, or be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie." *Ransom v. CSC Consulting, Inc.*, 217 F.3d 467, 471 (7th Cir. 2000) (internal citations omitted); *see also Beaman v. Marshall & Ilsley Tr. Co.*, 411 F.3d 854, 864 (7th Cir. 2005) ("There is no inherently racial component to an employer providing an employee with a critical (even an unfairly critical) performance review, providing an employee with insufficient mentoring, or determining that an employee does not yet have what it takes to be elevated to a managerial position.").

---

[5] This calculation excludes the time-sheet entry and tardiness issues that Redus does contest.

### 2. Similarly-Situated Employees

Redus also has failed to identify a similarly-situated employee outside of his protected class who was treated more favorably, as required by the fourth prong of the burden-shifting method.

The Seventh Circuit has defined a similarly-situated employee as one that is "'directly comparable' to plaintiffs 'in all material respects.'" *Alexander*, 739 F.3d at 981 (quoting *Abuelyaman v. Ill. State Univ.*, 667 F.3d 800, 810 (7th Cir. 2011) (citation omitted)). Factors to be considered include "whether the similarly[-]situated employee held the same position, had the same supervisor, was subject to the same standards, and engaged in similar conduct." *Alexander*, 739 F.3d at 981; *see Zayas*, 740 F.3d at 1158 ("Although 'precise equivalence' is not required, a plaintiff still needs to show that a comparator employee was 'treated more favorably by the same decisionmaker,' even though they were both 'subject to the same standards of conduct' and engaged in similar, but not necessarily identical, conduct.") (quoting *Coleman v. Donahoe*, 667 F.3d 835, 846-48, 850 (7th Cir. 2012)).

None of the employees identified by Redus as being similarly-situated have a similar disciplinary history to him. While Redus claims that the other employees had multiple PIPs, there is no indication that their conduct implicated safety-related concerns and warnings. Redus, in addition to receiving several PIPs, also received verbal and written warnings as well as one-, three-, and five-day suspensions. Yet he continued to have safety violations on the job.

\*\*\*

In sum, based on the record before the Court, Redus has failed to create a genuine issue of fact as to whether he was meeting Illinois Bell's legitimate employment expectations or whether there are similarly-situated employees who were treated more favorably than him. For these

reasons, the Court grants Defendant's motion for summary judgment on Redus's age and race discrimination claims, as well as his retaliation claims. *See Alexander*, 739 F.3d at 983 ("Like a discrimination claim, a claim of retaliation may be established through the direct or indirect method of proof. Plaintiffs proceed under the indirect method, which 'mirrors that for discrimination.'") (quoting *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 788 (7th Cir. 2004)).

## II. Hostile Work Environment Claim[6]

To establish the existence of a hostile work environment, Redus must show that because of his race or age: (1) he was subjected to "unwelcome harassment," (2) the harassment was "based on" his race and/or age, and (3) "the harassment was sufficiently severe or pervasive so as to alter the condition of [his] employment and create a hostile or abusive atmosphere." *Lucero v. Nettle Creek School Corp.*, 566 F.3d 720, 731 (7th Cir. 2009) (quoting *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 940 (7th Cir. 2007)); *see also Fugate v. Dolgencorp, LLC*, 555 Fed. Appx. 600, n.1 (7th Cir. 2014) (assuming without deciding that plaintiffs may bring a claim of a hostile work environment under the ADEA). Where the allegations of harassment relate to a co-worker, "the employer is liable only if the employer is negligent in discovering or remedying the harassment." *Lambert v. Peri Formworks Sys., Inc.*, 723 F.3d 863, 866 (7th Cir. 2013). It is important to remember that "discrimination laws do not mandate admirable behavior from employers, through their supervisors or other employees. Instead, the law forbids an employer from creating an actionably hostile work environment for members of protected classes." *Russell*, 243 F.3d at 343.

---

[6] While the complaint does not have a clearly labeled claim for a "hostile work environment," Redus does raise harassment claims, which are traditionally part of a hostile work environment claim. The Court thus construes the complaint as raising a hostile work environment claim as well.

All the specific incidents of harassment that Redus has identified came from his co-workers.[7] For example, while Redus claims that Gerdes was present at least twice when the "Sanford and Son" ringtone played, Redus does not claim that he complained about the ringtone to Gerdes or that Gerdes commented on the ringtone or participated in any conversation about the ringtone. Redus claims that he complained to Gerdes in October 2010, but the extent of his complaint was "how about the name-calling?" Redus does not claim that he alerted Gerdes to comments based on his race or age. *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) ("Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient."); *see also Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 392 (7th Cir. 2010) ("Employers need not divine complaints from the ether, guessing at the subjective suspicions of employees. An aggrieved employee must at least report—clearly and directly—nonobvious policy violations troubling him so that supervisors may intervene.").

Even if the treatment by his co-workers described by Redus rose to the level of a "hostile or abusive atmosphere," he has not presented evidence that his supervisors were negligent in discovering or remedying the harassment. The first time that Redus raised specific comments with management was at the November 3, 2011 meeting with Harper and Redus's union stewards. Redus claims the name-calling continued after that meeting, but he is unable to identify any specific instance and he was out on leave from December 19, 2011 to July 2012. When he returned to work in July 2012, Redus "didn't get any name-calling in that time frame," and then he went out on leave in August 2012. (DRPSAMF ¶ 12.) *See Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 637 (7th Cir. 2009) ("There is no question that a 'stoppage of harassment shows

---

[7] As discussed above, Redus attempts to characterize the "no accesses" comment by Wiley to Harper as harassment. But he does not connect that comment to his race or age.

effectiveness' . . . .") (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 676 (10th Cir. 1998)). He does not claim that he reported any additional name-calling to his supervisor or management after the November 3, 2011 meeting. Redus does claim that Gerdes passed around a handout the next day at a team meeting showing mistakes on the job that were attributed to Redus. But Redus has presented no evidence linking Gerdes's conduct to Redus's membership in a protected class, and further, he cannot reasonably claim that a handout identifying mistakes that Redus does not contest he made constitutes harassment based on his protected class.

## CONCLUSION

For the reasons stated above, the Court grants Illinois Bell's motion for summary judgment.

ENTERED:

Dated: September 17, 2018

_____

Andrea R. Wood
United States District Judge